*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL DEPP MONROE,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2019

No. 343129
Wayne Circuit Court
LC No. 17-007702-01-FH

Before: LETICA, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant, Michael Monroe, appeals as of right his bench trial convictions of assault with intent to do great bodily harm less than murder, MCL 750.84(1)(a), felonious assault, MCL 750.82, aggravated domestic assault (second offense), MCL 750.81a(3), possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, interference with reporting a crime, MCL 750.483a(2)(a), and domestic violence, MCL 750.81(2). Monroe argues that his defense lawyer provided constitutionally ineffective assistance by ignoring favorable e-mails and text messages and by failing to call two eyewitnesses who were willing to testify on Monroe's behalf. Because further factual development is required, we remand for a *Ginther*[1] hearing.[2]

## I. BASIC FACTS

On July 29, 2017, there were a series of physical altercations between Shyniece Williams and Monroe. At the time Williams and Monroe were in a dating relationship. Williams testified that she went with her daughter and Monroe to an apartment belonging to Deandre Monroe, so

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] We note that the judgment of sentence incorrectly states that Monroe was convicted by a guilty plea as opposed to by the court following a bench trial. Accordingly, on remand, the trial court shall amend the judgment of sentence to reflect the actual method of conviction. See *People v Avant*, 235 Mich App 499, 521; 597 NW2d 864 (1999).

that a nearby mechanic could fix her vehicle. Deandre is Monroe's brother. While Williams was inside the apartment with her daughter and Deandre, a woman knocked on the door. Deandre identified the woman as Tajanay Salter,[3] and he testified that Salter was Monroe's girlfriend. Salter and Williams got into an argument, and Williams went outside with her daughter. According to Williams she screamed questions at Monroe about who Salter was and then demanded her car keys. Williams stated that Monroe gave her the keys and, as she was screaming at him, he punched her in the face so hard that she fell to the ground. Williams stated that Deandre and the mechanic helped her up, and she walked away from the area with her daughter. Williams testified that Monroe followed her and, after becoming frustrated, hit her again in the face before leaving her and her daughter alone.

In contrast, Deandre testified that Williams hit Monroe with the keys, so Monroe pushed her and she fell to the ground. He agreed that after getting up, Williams walked away with her daughter. He offered no testimony regarding whether Monroe followed Williams and punched her after she walked away.

After a while, Williams returned to the apartment complex, this time with her brother. According to Williams, her brother spoke to Monroe after they arrived, and she was able to get in her car and drive away. Deandre, however, testified that Williams arrived with her brother and another man and that when she left she only drove a short distance before running back yelling that Monroe was a liar and that she was going to confront Salter. He recounted that Williams ran into the apartment building, but came back out with her brother and another man and they all left.

Williams returned to the apartment complex a third time, this time by herself. When she arrived, Deandre was outside. Williams stated that she told him she needed her purse and then went inside his apartment where she found Monroe and Salter naked. She yelled at Monroe about his actions and she told him she needed her purse. She said that he got out of the bed and started "tussling" with her, trying to get her down to the ground. She added that during the confrontation, Monroe grabbed a gun from a pink tote bag, pointed it at her, and ordered her to open her mouth. He put the gun in her mouth so she walked backward until she bumped into the couch. Monroe took the gun from her mouth and struck her face with it several times before choking her with his other hand. Williams stated that Deandre and another man entered the apartment and told Monroe to stop. She thought Deandre took the gun and stated that she saw him with it. Regardless, she testified that Deandre and the other man left the apartment while Monroe continued to punch her face.

---

[3] Tajanay's last name was not mentioned at trial; however, Monroe submitted an affidavit from "Tajania Salter" in connection with his motion for an evidentiary hearing or a new trial. Comparing Salter's affidavit with the trial testimony, it appears likely that "Tajanay" and "Tajania" are the same individual. Accordingly, for ease of reference we will refer to Tajanay as Salter in this opinion.

At some point, Williams got her purse and keys, and Monroe grabbed her and threw her out the door. Williams stated that she went outside and got in her car. She told Monroe that she was going to call the police but he grabbed her phone and threw it on the ground. She asked for it to be returned to her and Deandre handed it to her. Williams added that Monroe "busted" the back passenger window using his hands before she was able to drive away.

Deandre recounted a different version of the third confrontation. He stated that when Williams arrived her purse was in the backseat of her vehicle, but she went into the apartment, claiming that her purse was inside. He followed her after at least five minutes had passed. When he got inside, Monroe was wearing boxers and Salter had a sheet on. He stated that Salter was pushing Williams against the wall and that Monroe broke them apart and told Williams to "leave, leave," but she would not. He stated that Monroe kept grabbing Williams and telling her to leave, but Williams was "fighting against all that." Deandre also indicated that while that was occurring he noted that "they" had "punched all type of holes in [his] walls." He stated that while he was in the apartment he did not see a gun and he did not see Monroe strike Williams. He added that Williams eventually walked out of the apartment. Monroe left as well, and then, after a while, Deandre followed. Outside, Deandre saw that Williams's car window was broken and her phone was in pieces on the ground. Deandre said he picked up the pieces, put the phone back together, and handed it to her before she drove away. He did not see Monroe break the window.

After Williams left, she called the police and told them her head hurt and she felt dizzy. She was directed to pull over and wait for help. A police officer testified that when he arrived he saw Williams being helped from her vehicle by emergency medical services. He stated that her face was noticeably swollen and bruised all over. Williams reported that she had been assaulted by Monroe, who she asserted had punched her and hit her in the face with a gun. Williams was taken to the hospital via ambulance, but did not have any injuries other than facial bruising. Williams testified that, a few days later, Monroe texted her saying, "Sorry for putting my hands on you."

As indicated above, the trial court convicted Monroe of assault with intent to do great bodily harm less than murder, felonious assault, aggravated domestic assault (second offense), felony-firearm, interference with reporting a crime, and domestic violence. Following the entry of a judgment of sentence, Monroe moved for a new trial or, alternatively, for a *Ginther* hearing, asserting that his defense lawyer had provided constitutionally deficient representation by failing to call two witnesses and by failing to use evidence in the form of e-mails and text messages that Monroe had provided him with. In support of his motion, Monroe submitted three affidavits: one from himself, one from Salter, and one from Timothy Sanders, who was a resident of the apartment complex. Monroe did not provide copies of the e-mails or text messages that he allegedly provided to his defense lawyer. Following a hearing on the motion, the trial court determined that the affidavits did not satisfy the requirements set forth in MCR 2.119(B). Additionally, the court noted that any testimony from Salter and Sanders would likely have been barred because they did not comply with the court's sequestration order. Finally, the court found that the proposed testimony was merely cumulative to the trial testimony. Accordingly, the court denied Monroe's motion.

This appeal follows.

## II. INEFFECTIVE ASSISTANCE

### A. STANDARD OF REVIEW

Monroe argues that he was deprived of the effective assistance of a trial lawyer because his lawyer failed to present certain documentary evidence and failed to call Salter and Sanders on his behalf. "Whether a person has been denied the effective assistance of [a lawyer] is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The defendant bears the burden of establishing the factual predicate of his claim that his defense lawyer did not provide effective assistance. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Accordingly, to the extent that a defendant's claim depends on facts not of record, it is incumbent on the defendant "to make a testimonial record at the trial court level . . . ." *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973). A defendant preserves such a claim by moving for a new trial or an evidentiary hearing to develop the record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). In this case, Monroe preserved his challenge to the effectiveness of his defense lawyer by filing a motion for a new trial or an evidentiary hearing, which was denied by the trial court. On appeal, the only relief requested is a remand for a *Ginther* hearing.

### B. ANALYSIS

It is well established that criminal defendants have a constitutional right to the effective assistance of a lawyer. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). Defense lawyers are presumed to provide effective assistance, and the defendant bears the burden of overcoming that presumption on appeal. *People v Solmonson,* 261 Mich App 657, 663; 683 NW2d 761 (2004). In addition, courts give defense lawyers "wide discretion in matters of trial strategy because counsel may be required to take calculated risks to win a case." *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). Thus, this Court will not substitute its judgment for that of the defendant's lawyer regarding matters of trial strategy, nor will it assess the defendant's lawyer's competence with the benefit of hindsight. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

In this case, Monroe argues that his lawyer provided ineffective assistance because he failed to call two eyewitnesses. "Decisions on whether to call or question witnesses are presumed to be matters of trial strategy." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). Further, the failure to call a witness only constitutes ineffective assistance of a defense lawyer when it deprives the defendant of a substantial defense. *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009). "A substantial defense is one that might have made a difference in the outcome of the trial." *Id*. (quotation marks and citation omitted).

Monroe requests that this Court remand to the trial court for a *Ginther* hearing. Although the trial court denied Monroe's request for a *Ginther* hearing, this Court is not precluded from revisiting the issue. See *id*. at 368-369; see also MCR 7.216(A)(5) (permitting this Court to "remand the case to allow additional evidence to be taken."). A remand for a *Ginther* hearing is appropriate if the "defendant has demonstrated [an] issue for which further factual development would advance his claim." *Chapo*, 283 Mich App at 369. A defendant can demonstrate the need

for further factual development by presenting affidavits or *by making an offer of proof*. See MCR 7.211(C)(1).

Monroe attached three affidavits to his motion for a *Ginther* hearing and/or new trial. In the proceedings before the trial court, the prosecution asserted that the affidavits were deficient because they did not comply with the requirements for an affidavit under MCR 2.119(B)(1), so it asked the court to strike them. At oral argument, Monroe's lawyer conceded that the affidavits were technically deficient, but he asserted the court should nevertheless consider them, noting that they were all signed and that the affidavits from Salter and Sanders were also notarized. In its ruling, the court held that the affidavits were deficient, but it still evaluated them as an offer of proof. Accordingly, we too consider them as offers of proof.

Monroe's statement is that he provided information to his defense lawyer, which was ignored by his lawyer. Specifically, he asserts that he provided his lawyer with e-mails and text messages from Williams and that he directed his lawyer to two eyewitnesses who would have testified on his behalf. Merely stating that favorable information ignored after it was brought to a defense lawyer's attention is not sufficient to establish the need for a *Ginther* hearing. However, taken with other affidavits or offers of proof, it may be sufficient, so we must also consider the other information submitted.

As an initial matter, although Monroe asserts that he provided relevant text messages and e-mails, the content of the messages is not included with his offer of proof. As a result, we have no basis to conclude that further factual development would advance his claim.

Next, the proposed testimony from Sanders, a resident of the apartment complex, is largely cumulative of Deandre's testimony. Like Deandre, Sanders testified that Williams returned on the third occasion and told Deandre that she had forgot her wallet. Further, like Deandre, Sanders stated that he could see Williams's wallet in the backseat of her vehicle and that Williams waited on the hood of her vehicle until someone opened the door to the apartment complex before running inside. Unlike Deandre, however, Sanders explained that when Williams came back outside, Monroe was behind her and knocked her phone out of her hand. Sanders stated that when Williams demanded that Monroe pick up the phone, and, when Monroe picked it up she tried to hit him with her car. The part of his proposed testimony regarding the car is contrary to the testimony from Williams and Deandre, who both testified that Deandre picked up the phone. Thus, it is not clear on this record that this testimony would have any significant impact on the trial's outcome given that it was largely cumulative or contrary to all other evidence presented. In other words, this statement does not show that further factual development would advance Monroe's claim of ineffective assistance.

Next, in her statement, Salter stated that after Williams left the apartment the first time, Monroe came inside and they went to bed together. She then stated:

> I was woke up to a knock at the door. I went and approached the door asking who it was when [Williams] made a male voice saying it me, and just pushed her way in, she went over to [Monroe] who was still sleeping and started slapping his face, he just lay there covering his head and face[.] I said to keep your hands off him, she then walked over to me saying "wass up" and swung over the chair in the

living room and hit me. I swung back and we fought back and forth for a while before [Monroe] got up and said that's enough and broke us up. He asked her to leave and she was smacking him, and he said to her just leave and she started yelling really [Monroe] you gone put me out for her[,] still smacking him, and he said just leave[.] [S]he left eventually.

Salter also indicated that there was no gun "involved at all while Ms. Williams was in the apartment." The court erroneously found that this testimony was cumulative to the trial testimony.

Deandre testified that he observed Williams enter the apartment building just before the third altercation. He stated, however, that he did not follow her until at least five minutes had passed. In other words, Salter's testimony is that there was no gun involved and that Monroe did not hit Williams from the time she entered the apartment until the time she left, whereas Deandre's testimony is that *he* did not see a gun or see Monroe hit Williams when he came into the apartment at least five minutes after the confrontation began. Given that the testimony covers different periods of time, it is not cumulative. Furthermore, Salter's testimony is significant in that it goes to the heart of several of the charges, including felonious assault and felony-firearm.

On this record, we are unable to discern whether there was a strategic reason for Monroe's lawyer's decision to not call Salter as a witness. The prosecution suggests that the defense strategy was to present a witness who contradicted various aspects of Williams's trial testimony and emphasized the lack of physical evidence supporting Williams's claim that she was beat in the face with a handgun. The prosecution, however, ignores that Monroe's lawyer called a single witness: Deandre. Then, although Williams had testified that Deandre was present for part of the assault with the gun and that he did, in fact, have the gun at one point, Monroe's lawyer did not ask any questions regarding the third incident. Instead, Deandre testified regarding the events in the apartment during the third occasion solely in response to questions by the prosecution and the court. Consequently, the defense strategy appears to have been to call Deandre, a witness who was present for at least part of the third incident, and then wholly fail to ask any questions regarding what happened in the apartment at that time. Similarly, Monroe's lawyer asked no questions of Deandre with regard to whether he returned Williams's phone to her and whether he observed Monroe breaking Williams's back window before she left. Again, that information was elicited through questioning by the prosecution and the court. Under these circumstances, we will not simply assume that the defense strategy was to not present Salter's testimony because it was partially cumulative to testimony that the defense did not actually attempt to present. And, again, significant aspects of Salter's testimony were (1) favorable to the defense and (2) not cumulative to Deandre's trial testimony. Without a *Ginther* hearing, we cannot evaluate whether the decision to not present the noncumulative testimony constituted reasonable professional judgment given the facts of the case and the defense strategy and options. As a result, we conclude that a remand for a *Ginther* hearing is necessary to further

develop the factual record with respect to the reason(s) for Monroe's lawyer opted to not present Salter's testimony. See MCR 7.211(C)(1)(*ii*).[4]

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Mark T. Boonstra

---

[4] The trial court was concerned that Salter and Sanders violated the sequestration order. However, as they were never identified as witnesses, they were not subject to that order. Moreover, the question before the trial court was whether Monroe's lawyer provided ineffective assistance by not calling Salter and Sanders as defense witnesses. In order to call them, the witnesses would have had to be identified, and, under such circumstances, they would have been subject to the sequestration order. It is not proper to presume that, if directed to leave the courtroom pursuant to the sequestration order, they would have nevertheless stayed. It is not proper for a court to assert, with the benefit of hindsight, that the witnesses will not be allowed to testify because while they were not identified as witnesses they may have been in the courtroom in violation of an order they were not subject to. Therefore, the sequestration order is irrelevant as to whether Monroe's lawyer provided ineffective assistance.